IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STEVEN MACHALINSKI,          )
                                     )
         Plaintiff-Claimant,      )
                                     )     No. 12 C 944
     vs.                           )
                                     )     Jeffrey T. Gilbert
CAROLYN W. COLVIN, Acting     )     Magistrate Judge
Commissioner of Social Security,   )
                                   )
        Defendant-Respondent.   )

**MEMORANDUM OPINION AND ORDER**

Claimant Steven Machalinski brings this action under 42 U.S.C.§ 405(g) seeking reversal

or remand of the decision of Respondent Carolyn Colvin, Acting Commissioner of Social

Security ("Commissioner"), denying Claimant's application for a closed period of disability

insurance benefits.[1]  Claimant argues that the decision of the Administrative Law Judge ("ALJ")

denying his application for a closed period of disability and benefits come should be reversed or,

alternatively, should be vacated and remanded to the Social Security Administration ("SSA") for

further proceedings.  In support of his motion for summary judgment, Claimant raises the

following issues: (1) whether the ALJ reasonably determined that Claimant worked until January

14, 2007; (2) whether the ALJ erred in finding that Claimant's impairment did not meet Listing

1.03 between December 31, 2006 and March 31, 2009; and (3) whether the ALJ reasonably

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.
Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Carolyn W. Colvin is automatically
substituted as the Defendant-Respondent in the case.  No further action is necessary to continue this suit
by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

concluded that there was no evidence to support a finding that Claimant would have required

more than six days of absences from work during a 12-month period.

For the reasons discussed herein, Claimant's motion for summary judgment is denied

[Dkt.#12]. The Commissioner's cross-motion is granted [Dkt.#17], and the Commissioner's

decision denying Claimant's application for disability insurance benefits is affirmed.

## I. BACKGROUND

### A.     Procedural History

Claimant Steven Machalinski filed his application for a period of disability and disability

insurance benefits on October 23, 2008, alleging a disability onset date beginning January 14,

2007. R.14. Claimant later amended his disability onset date to December 31, 2006 and

requested a closed period of disability ending on March 1, 2009. R.14. The SSA initially denied

the application on December 10, 2008 and upon reconsideration on March 4, 2009. R.14.

Thereafter, Claimant filed a written request for a hearing on March 15, 2009. R.14 Claimant

appeared with his attorney and testified at a hearing held on August 26, 2010 before ALJ Karen

Sayon. R.14. Vocational expert Thomas Grzesik also appeared and testified at the hearing. R.14.

No medical expert testified at the hearing.

On November 22, 2010, the ALJ issued her decision finding that Claimant was not

disabled under sections 216(i) and 223(d) the meaning of the Social Security Act for the period

between December 31, 2009 and March 1, 2009. R.21. Specifically, the ALJ found that

Claimant has a severe left knee impairment. R.16. The ALJ, however, concluded that Claimant

does not have an impairment or combination of impairments that meets or medically equals any

of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d),

2

404.1525 and 404.1526). R.17. The ALJ then concluded that Claimant has "the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) that includes a sit/stand options that allows the claimant to alternate between sitting and standing after 30 minutes, for five minutes at a time; no climbing ladders, ropes or scaffolds; no kneeling; no crawling; and only occasional balancing, crouching stooping, and climbing ramps and stairs." R.17. The ALJ found that Claimant is not capable of performing his past relevant work, but concluded that, "[c]onsidering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 C.F.R. 404.1569 and 404.1569(a))." R.20.

On November 29, 2010, Claimant filed a request with the Appeals Council for review of the ALJ's decision. R.121. On February 3, 2012, the Appeals Council denied Claimant's request for review of the ALJ's decision, making the ALJ's determination the final decision of the Commissioner. R.1-6. Claimant seeks review in this Court pursuant to 42 U.S.C.§ 405(g).

**B.    Hearing Testimony**

**1. Claimant Steven Machalinski**

Claimant was fifty years old at the time of the hearing. R.32. He completed the eighth grade and never obtained a GED. R.32. Claimant testified that he had worked as a plasterer which he described as "heavy construction work." R.33. He testified that he injured his left knee on the job and stopped working in December 2006. R.33. Claimant has not worked since he was released to go back to work by his doctor in March 2009, but he has applied for jobs. R.33, 36. At the time of the hearing, Claimant was receiving $800 a week from his workers compensation settlement. R32.

Claimant testified that he underwent his first surgery in January 2007 but that the surgery failed to resolve his pain, and he had another operation in July 2007 to repair his Anterior cruciate ligament ("ACL"). R.34. Claimant testified that the second surgery actually made his pain worse and that his doctor told him that his bones had been pulled too close together, which was making his arthritis worse. R.34. Claimant testified that he experienced increased pain, swelling, and decreased range of motion and that he could not kneel or walk comfortably. R.34. Claimant also testified that he used crutches after his first surgery and a walker and a cane after the second surgery. R.34-35.

Claimant testified that he had left knee replacement surgery in November 2008, because his pain continued to get worse. R.35. In the time between his second surgery and his knee replacement, he testified that he was taking Vicodin and Ibuprofen for pain. R.35. He testified that the Vicodin made him tired and he did not feel like himself. Claimant also testified that even though he felt better and his doctor released him to work in March 2009, he still had pain in his left knee. R.35. He reported no other problems. R.36.

Claimant testified that there was "no way" he would have been able to work during his surgeries and recovery. R.37. He explained that he could not walk correctly, could not sit for long periods of time, and had trouble with stairs. R.37. Claimant also testified that he could only sit for twenty minutes without getting up because his knee would lock up and ache when he sat down. R.38.

After injuring his knee, Claimant testified that he tried to stretch and do his exercises. R.38-39. Claimant testified that his relationship with his wife suffered because she had to go back to a full time job. R.39. He testified that his children had to do his chores for him and that

4

his wife cut the grass.  R.39.  Claimant testified that his house was in worse condition because he had been unable to take care of it.  R.39.  Claimant testified that he tried to bowl with his children after his second surgery but only attempted one roll.  R.39-40, 44.  He explained that his knee could not handle the pressure and he was unable to walk up and roll the ball down the lane.  R.40.  Claimant explained that he used to cut the grass, fix the pool, paint, and shovel snow, but he had not done any of those activities during his recovery. R.41. He described his knee popping out when he walked a certain speed. When his knee popped out he would stop walking. Claimant testified that he couldn't walk more than fifteen minutes, and that there was always pain when he walked. R.41.

Claimant testified that he was depressed when his condition did not improve after the second surgery. R.42.  He explained that he has a high pain tolerance and only opted to have the knee replaced because he was unable to walk correctly. R.42. Although he usually attended functions at his children's schools, Claimant testified that he did not during the period in question. Claimant testified that he did not drive when he was taking Vicodin because it affected his ability to concentrate and that he continued to have difficulty sleeping.  R.44.

### 2. Vocational Expert Thomas Grzesik

The VE described Claimant's past work as a plasterer with medium exertional level according to the Dictionary of Occupational Titles ("DOT") and heavy as performed.  R.45. The ALJ ask the VE to assume a hypothetical individual of Claimant's age and education who could perform light work, with no crawling, kneeling, or climbing of ladders, ropes, and scaffolds, and only occasional postural limitations.  R.45-46. The VE testified that the hypothetical individual

would not be capable of Claimant's past work, but could work as an office helper, a sales attendant, and a cashier. R.46.

The ALJ changed the hypothetical and restricted the individual to sedentary instead of light work. R.46. The VE found that individual capable of work as a call out operator, an information clerk, and an order clerk. R.46. The ALJ then added a sit/stand option to the sedentary hypothetical, specifying that the individual could stand for five minutes every thirty minutes while remaining on task. R.46. The VE testified that the sit/stand option would not eliminate any of the jobs previously quoted.

The VE added that employers would not tolerate an individual missing three days of work per month or being off task thirty percent of the work day. R.48. The VE also explained that most jobs allowed only six absences in a year. R.49-50.

## C. Medical Evidence

On January 17, 2007, Claimant reported instability and a great deal of pain in his left knee. R.284. Dr. Raghu Pulluru performed a left knee arthroscopy, partial medial and lateral meniscectomy and patellofemoral chondroplasty on January 29, 2007. R.289. Dr. Pulluru opined that Claimant would need total knee replacement in "the next few years." R.283.

On February 12, 2007, Claimant saw Vasilike Sandas, M.D. for an initial therapy evaluation. Dr. Sandas anticipated significant pain relief with therapy and rehabilitation. R.226. At a progress evaluation on March 12, 2007, Claimant reported gradual improvement in pain and strength. R.231. He was scheduled for two more months of physical therapy and told to remain off work. R.231. Claimant was yet to attempt any heavy activities on April 4, 2007, but he was found to be doing "very well." R.282. On May 2, 2007, Claimant was noted to be improving

and wearing a brace for heavy activities.  R.281. On May 23, 2007, Claimant was restricted to

full time light duty work, lifting no more than ten pounds, with no repeated bending, squatting,

twisting or climbing, and no kneeling. R.280.

A Functional Capacity Evaluation ("FCE") was performed on June 1, 2007, and the

evaluator determined that Claimant was capable of "light physical demands." R.332-333.  On

June 20, 2007, Dr. Pulluru noted that Claimant's functional status was "quite poor" due to

significant instability in his knee.  R.279.  Dr. Pulluru determined that ACL reconstruction was

necessary. R.279.  On July 23, 2007, Claimant underwent a left knee arthroscopy, arthroscopic

ACL reconstruction with anterior tibialis allograft and partial medial meniscectomey at the

Deerpath Orthopedic Surgery Center. R.287.

Following the surgery, Claimant presented for another physical therapy evaluation on

July 30, 2007.  R.264. On August 1, 2007, Claimant's pain was noted to be severe and he was

using crutches.  R.247.  His physical therapist wrote that Claimant was very motivated and his

rehabilitation potential was excellent.  R.330.  Dr. Pulluru noted that Claimant was still not

cleared to return to work.  R.278.

Claimant still had pain on August 22, 2007, but reported that his knee felt more stable.

R.277.  On September 19, 2007, Claimant reported some pain but said that his knee was no

longer giving out.  R.276.  On October 17, 2007, Claimant followed up with Dr. Pulluru who

limited him to sedentary work.  R.275.

On November 14, 2007, Claimant described having good and bad days and received

injections for the pain.  R.274.  Claimant's physical therapist noted his exercise program had

plateaued due to "intermittent flare up's [sic] with increased pain and loss of mobility with swelling." R.324.

On December 12, 2007, Claimant was again evaluated by Dr. Pulluru. Dr. Pulluru wrote that although Claimant's knee was more stable, his pain was increasing. R.273. Claimant's physical therapist wrote that he was unable to progress Claimant's rehabilitation due to increased pain levels. R.322.

Claimant received Synvisc injections on January 9 and January 16, 2008. A physical examination on January 16, 2008 revealed right hip bursitis and left knee arthritis. R.271-272. On January 23, 2008, Claimant received his third and final Synvisc injection. R.270. On February 20, 2008, Claimant reported improvement from the Synvisc injection but was still having "significant symptoms." R.269.

In relation to a worker's compensation claim, an FCE was conducted on February 28, 2008. R.295-321. The administering physical therapist found Claimant capable of "light" physical demands and that he was unable to return to his past work as a plasterer. R.296. On March 19, 2008, Claimant was seen for a follow up appointment with Sara Jorgen's, PA-C, and she noted that Claimant would "likely need Synvisc or Supartz injections every six months until eventually he will need knee replacement." R.268. On July 23, 2008, Claimant received a Synvisc injection. R.267. On July 30, 2008, partial improvement was reported and Claimant received a second Synvisc injection. R.266. There was no improvement in Claimant's condition on August 6, 2008, and he was given a third injection of Synvisc. R.265.

On September 11, 2008, Dr. Pulluru wrote that Claimant was in severe pain and still had significant difficulty. R.264. X-rays showed severe medial compartment arthritis with

"bone-on-bone" contact. Dr. Pulluru recommended an arthroplasty of the knee, noting that his work status remained the same. R.264. On October 14, 2008, Dr. Pulluru recommended that Dr. Rezin perform the procedure. R.263.

On October 15, 2008, Keith M. Rezin, M.D. noted that Claimant walked with a limp, had obvious crepitus, and limited range of motion. R.262. X-rays revealed an arthritic left knee, which was noted to be "quite severe." R.262. Claimant consented to total knee replacement surgery. R.262. On October 28, 2008, Claimant was scheduled for physical therapy three times a week for four to six weeks, and prescribed Norco and Arixtra. R.261.

On November 3, 2008, Claimant underwent total left knee arthroplasty at Morris Hospital. R.286. On December 17, 2008, X-rays showed Claimant's cemented device in nice alignment. R.441. Dr. Rezin opined that Claimant would "continue to be totally disabled for at least two months and possibly up to three months." R.432.

On November 3, 2009, non-examining physician Charles Wabner completed an RFC form for the SSA. R.440. Dr. Wabner found Claimant capable of light work with occasional kneeling and climbing of ramps and stairs, and no ladders, ropes, scaffolds. R.434-435. Francis Vincent M.D. affirmed Claimant's RFC on March 3, 2009. R.533-535.

**D.      The ALJ's Decision**

On November 22, 2010, the ALJ issued his decision finding that Claimant was not disabled under sections 216(i) and 223(d) the meaning of the Social Security Act for the period between December 31, 2009 and March 1, 2009. R.21. At step one, the ALJ found that Claimant had engaged in substantial gainful activity after December 31, 2006, the amended alleged onset date. R.16. Specifically, the ALJ found that Claimant had engaged in substantial gainful

9

activity until January 14, 2007, which was the date Claimant originally alleged as the disability onset date. R.16.

At step two, the ALJ found that Claimant has a severe left knee impairment. R.16-17.  At step three, the ALJ concluded that Claimant does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). R.23. The ALJ considered Claimant's residual functional capacity and concluded that Claimant has "the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) that includes a sit/stand options that allows the claimant to alternate between sitting and standing after 30 minutes, for five minutes at a time; no climbing ladders, ropes or scaffolds; ne kneeling; no crawling; and only occasional balancing, crouching stooping, and climbing ramps and stairs." R.17.

At step four, the ALJ concluded that, based on his residual functional capacity, Claimant is not capable of performing his past relevant work.  R.20.  At step five, the ALJ ultimately concluded that "[c]onsidering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 C.F.R. 404.1569 and 404.1569(a))." R.20.

## II.  LEGAL STANDARD

### A.    Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review.  *Sims v.*

*Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id*. Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

11

**B.      Disability Standard**

Disability insurance benefits are available to a claimant who can establish she is under a

"disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th

Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected . . .

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An

individual is under a disability if she is unable to do her previous work and cannot, considering

her age, education, and work experience, partake in any gainful employment that exists in the

national economy. 42 U.S.C. § 423(d)(2)(A).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled.

20 CFR. § 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in the following order:

(1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a

severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment;

(4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable

of performing other work. *Id.* Once the claimant has proven she cannot continue her past

relevant work due to physical limitations, the ALJ carries the burden to show that other jobs

exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th

Cir. 2007).

## III.  DISCUSSION

Claimant raises the following issues in support of his motion for summary judgment: (1)

whether the ALJ reasonably determined that Claimant worked until January 14, 2007; (2)

whether the ALJ erred in finding that Claimant's impairment did not meet Listing 1.03 between

December 31, 2006 and March 31, 2009; and (3) whether the ALJ reasonably concluded that there was no evidence to support a finding that Claimant would have required more than 6 days of absences from work during a 12-month period.

**A.    The ALJ Reasonably Concluded That Claimant Worked Until January 14, 2007**

Claimant argues that the ALJ erred in finding that he continued to work until January 14, 2007.  Claimant's Br.[Dkt.#13], at 13-14.   The Court disagrees.

It is axiomatic that the claimant bears the burden of producing evidence that supports his claim of disability. 42 U.S.C. § 423(d)(5)(A); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008).  the claimant also bears the burden of proof at each of the first four stages of the sequential analysis and retains the burden of persuading the Commissioner that he is disabled at every step of the disability process. *See* 20 C.F.R. § 404.1512(a); *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Green v. Shalala*, 51 F.3d 96, 101 n.5 (7th Cir. 1995).

It is undisputed that Claimant injured his knee at work in March 2006, but continued to work for several months thereafter. After he filed his application for benefits, Claimant filed a statement that he stopped work as of December 31, 2006.  R.211.  The sole evidence of Claimant's last day of work consists of conflicting statements from Claimant himself.

In her opinion, the ALJ acknowledged that Claimant amended the date of the alleged onset of his disability to December 31, 2006.  R.16.  The ALJ, however, also noted that Claimant identified January 14, 2007, as the date of onset in an earlier filing.  R.16, 145.  The ALJ also correctly observed that on February 12, 2007, Claimant told his physician that he had been off work for four weeks, which corresponds to a stop date of January 14, 2007.  R.16, 225.

The ALJ has the exclusive responsibility to resolve conflicts in the evidence and her "reasonable resolution of conflicts in the evidence is not subject to review." *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1989); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 541 (7th Cir. 1992). An ALJ also is in the best position to determine the credibility of witnesses, and this Court reviews that determination deferentially. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (citing *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)). The ALJ has the discretion to discount testimony on the basis of evidence in the record. *Johnson v. Barnhart*, 449 F.3d 804, 806-807 (7th Cir. 2006).

Here, the ALJ reasonably found that Claimant's earlier statements were more credible, because Claimant made them closer in time to the event at issue. R.16; *see also Wolfe v. Shalala*, 997 F.2d 321, 327 (7th Cir. 1993) (affirming ALJ's rejection of testimony that contradicted earlier statements about the same activity). The ALJ sufficiently explained how she resolved the conflicts in Claimant's testimony and the record evidence and reasonably determined that Claimant continued to work until January 14, 2007.

**B.** **The ALJ Reasonably Concluded That Claimant Did Not Meet Listing 1.03**

Claimant argues that he met the criteria for Listing 1.03 during the time in which he is seeking a closed period of disability from December 31, 2006 through March 1, 2009.[2] Claimant's Br. [Dkt.#13], at 10-12. Alternatively, Claimant maintains that he otherwise lacked the residual functional capacity to perform substantial gainful activity during that same time. Claimant's Br.[Dkt.#13], at 12-13. The Court is not persuaded by either argument.

_____

[2] Claimant concedes that he had regained the ability to perform substantial gainful activity by March 31, 2009. Claimant's Br. [Dkt.#13], at 3; *see also* R.214.

14

The SSA defines disability as the inability to engage in substantial gainful activity for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Similarly, a claimant can be considered disabled under the Listing 1.03 only if he remains unable to ambulate effectively for a continuous period of twelve months after his surgery. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 1.03.

In this case, as the ALJ recognized, Claimant had three separate surgeries between January 2007 and March 2009. R.17. He had arthroscopic knee surgery to repair a torn left meniscus in January 2007 (R.289-90); surgery to reconstruct a torn left ACL in July 2007 (R.287-88); and a total left knee replacement in November 2008 (R.252-255). Claimant also had silicon (Synvisc) injections in his knees in January 2008 and again in July 2008. R.269-70. Notwithstanding these surgeries, the ALJ reasonably concluded that Claimant was not disabled for a continuous twelve month period, because he regained the ability to perform a range of sedentary work during intervals after each surgery. R.18-20.

### 1. Claimant's First Surgery

Claimant had his first surgery on January 29, 2007. R.289. The ALJ observed within four months of his January 2007 arthroscopic surgery, Claimant rated his pain at only 2-3 on a 10-point scale, was taking only occasional over-the counter analgesics, and was participating in a work conditioning program where he reported being able to lift and carry up to 15 pounds, although he could not perform the heavy lifting that his past work as a plasterer required. R.18, 280. The ALJ similarly noted that a functional capacity evaluation performed in June 2007 concluded that Claimant was capable of light work, albeit with a diminished capacity for constant standing and walking. R.18, 332-33.

Claimant argues that the ALJ should not rely on the conclusion from the functional capacity examination because she could not be sure whether the evaluator was familiar with SSA's definition of "light work." Claimant's Br.[Dkt.#1S], at 11-12. However, the functional capacity evaluation makes clear that the evaluator used the definition set out in the DOT, which is the same definition that SSA uses. R.332; *see also* 20 C.F.R. § 404.1567.

Claimant also is simply wrong when he asserts that the functional capacity evaluation said nothing about his ability to ambulate effectively. The evaluation expressly evaluated Claimant's mobility and found that he had a demonstrated ability to stand and walk frequently, meaning from one-third to two-thirds of an eight-hour workday. R.333, 335-36. The ALJ reasonably explained that her rationale for determining Claimant could perform sedentary work also showed that he was not unable to ambulate effectively for any continuous twelve-month period. R.17.

Claimant also argues that the ALJ should not have accepted the results of the functional capacity evaluation because the occupational therapist who completed it was not an acceptable medical source. Claimant's Br.[Dkt.#13], at 11-12. However, SSA regulations and case law make clear that an ALJ may properly consider evidence from "other sources," including a functional capacity evaluation, to determine how a claimant's impairment affects his ability to work. *See* 20 C.F.R. §404.1513(d)(1); *Jens v. Barnhart*, 347 F.3d 209, 212-13 (7th Cir. 2003); *Books v. Chater*, 91 F.3d972, 975, 980 (7th Cir. 1996). Moreover, the ALJ expressly noted that the results of the functional capacity evaluation were consistent with a May 2007 statement from a physician's assistant who concluded that Claimant could engage in full-time work that did not

16

require lifting more than pounds, with no kneeling and no repeated postural activities.[3] R.19,

280. T

The ALJ appropriately articulated her reasoning. *See Johansen v. Barnhart*, 314 F.3d

283, 287 (7th Cir. 2002); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). The ALJ's

conclusion that Claimant regained the ability to perform a limited range of sedentary work

during a significant interval between his first and second surgeries is fully consistent with the

evidence she cites and appropriately accommodates Claimant's limitations.

### 2. Claimant's Second Surgery

The ALJ recognized that because of the continued instability in his knee, Claimant had a

second knee surgery on July 23, 2007 to repair a his ACL. R.18, 279. The ALJ acknowledged

that Claimant continued to experience pain following his second knee surgery. R.18, 265, 268,

273. The ALJ, however, correctly noted that about four weeks after the surgery, Dr. Pulluru

again indicated that Claimant was capable of seated work. R.18, 277. As the ALJ recognized,

Dr. Pulluru reaffirmed this assessment in September, October, November, and December 2007.

R.18, 19, 273-76. The ALJ further noted that by December 2007, still less than a year after

Claimant's first surgery, Dr. Pulluru found that Claimant's knee had stabilized and he had good

range of motion. R.18, 273. The ALJ reasonably explained that she found Dr. Pulluru's

assessments persuasive because he was Claimant's treating physician and his opinion was

---

[3] The ALJ acknowledged that a physician's assistant is also not an acceptable medical source within the meaning of SSA regulations, but explained that she gave weight to the opinion because the physician's assistant actually examined Claimant, and her conclusions were consistent with the other evidence in the record, including Claimant's surgeon Dr. Raghu Pulluru who affirmed the restrictions in July 2007 and stated that they would remain in place until Claimant had his second surgery in July 2007. R.19, 279.

consistent with the medical evidence in the record. R.19; *see also* 20 C.F.R. § 404.1527(d)(2);

*Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

The ALJ found further evidence that Claimant had regained the capacity to work in a

functional capacity evaluation performed in February 2008. R.18, 295-321. The functional

capacity evaluation specifically assessed Claimant's mobility and concluded that he could stand

and walk occasionally, meaning up to a third of an eight-hour workday. R.299. The limitations

in the functional capacity evaluation are fully consistent with the limitations that the ALJ

imposed in determining Claimant's residual functional capacity. R.17. As the ALJ recognized,

although the evaluation concluded that although Claimant could not return to his previous job as

plasterer, he had regained the ability to perform light work as the DOT. defined that term, with a

diminished tolerance for certain postural activities and for constant standing and walking over a

full workday. R.18, 296.

Dr. Pulluru and Sara Jurgen, a physician's assistant, examined Claimant in March 2008

and reviewed the functional capacity evaluation with him. R.268. Ms. Jurgen noted that

Claimant continued to experience pain and stated that, based on the functional capacity

evaluation, she would permanently restrict him to light duty work. R.268. She recognized that

the restrictions on postural activities and constant standing or walking would generally limit him

to seated work. R.268. She also expressly stated that Dr. Pulluru participated in developing this

plan of care for Claimant. R.268. The ALJ reasonably concluded that Ms. Jurgen' assessment

bolstered the findings in the functional capacity evaluation, and further supported her own

determination that Claimant regained the ability to perform a range of sedentary work. R.18-19.

The ALJ also correctly observed that Claimant sought no additional treatment from March to July 2008.[4]  R.18, 267-68.

### 3.  Claimant's Third Surgery

Dr. Keith Rezin performed a total knee replacement on Claimant in November 2008. R.352-54.  The ALJ accepted Dr. Rezin's December 2008 opinion that Claimant had been unable to work since his surgery and would be unable to engage in work for an additional two, possibly three months.  R.18-19, 432. The ALJ found that Dr. Rezin's opinion was consistent with a progress report from a work conditioning program that by the beginning of February 2009 Claimant had regained the ability to perform light to medium work. R.18, 459. The ALJ further noted that in late January 2009, Claimant himself informed his physical therapist that he could sit in a chair as long as he liked, stand as long as he wanted despite experiencing extra pain, walk up to a mile, and tolerate his pain without taking analgesics. R.18, 477.

All of the medical evidence cited by the ALJ and discussed herein reasonably supports the ALJ's conclusion that Claimant did not meet Listing 1.03 during a continuous 12-month period of time.  While there may have been some time during which Claimant was unable to ambulate effectively, the ALJ provided a logical bridge between the record evidence and her conclusion that there is substantial evidence demonstrating that Claimant did not remain unable to ambulate effectively for a continuous 12-month during that time.

**C.  The ALJ Reasonably Concluded That There Was No Evidence To Support A Finding That Claimant Required More Than Six Days Off During A 12-Month Period**

---

[4] In July 2008, Claimant informed Dr. Pulluru that the silicon injections had helped him greatly and requested another set of injections to control his symptoms.  R.267. As the ALJ recognized, Dr. Pulluru concluded that Claimant was doing well and stated that he would continue to treat him with the injections as long as they controlled his symptoms.  R.18, 267.

Claimant argues that the ALJ erred when she concluded that there was no evidence that Claimant required six absences in a 12-month period. Claimant's Br.[Dkt.#13], at 12-13. Claimant asserts that he was "in the care medical professionals on forty-one separate dates and in physical therapy an additional forty-five days." Claimant's Br.[Dkt.#13], at 13. Claimant argues such care and treatment would have caused him to be absent from work an amount of time that would have been unacceptable to an employer over a twelve-month period. Claimant's Br.[Dkt.#13], at 12-13. Claimant essentially argues that the ALJ should have taken a longitudinal perspective of the alleged period of disability without looking at the intervals between surgeries when Claimant may have bee able to work. This argument is misplaced and not persuasive.

It is not disputed, and the ALJ acknowledged, that there were periods of time when Claimant could not work, particularly in the immediate aftermath of his surgeries. R.18-19. The issue is whether Claimant was disabled for a continuous 12-month period or whether, after he had recovered from surgery (and during the intervals between surgeries), Claimant could have performed a sedentary job if he were hired. 42 U.S.C. § 423(d)(2)(a); *Garcia v. Secretary of Health & Human Services*, 46 F.3d 552, 558-59 (6th Cir. 1995). "The burden is on the claimant to show that he is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or that can be expected to last for a continuous period of not less than 12 months." *Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 512 n.3 (7th Cir. 1999). Claimant failed to carry his burden.

The ALJ reasonably determined that, for intervals after each of his surgeries, Claimant regained the ability to perform a range of sedentary work and, therefore, was not continuously

unable to work for any twelve consecutive months. R.20. The ALJ appropriately considered Claimant's reported symptoms, test results, medical records, and medical opinions from treating physicians and other sources in evaluating his condition after each surgery. 42 U.S.C. § 405(b)(1); 20 C.F.R. §§ 404.1512-1513, 404.1520, 404.1527-1529. The ALJ sufficiently explained how that evidence supported her determination that Claimant regained the ability to perform a range of sedentary work. *See Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). The evidence that the ALJ cites fully supports her determination that Claimant was not continuously disabled for any period of at least twelve consecutive months during the period of disability alleged in this case. Because there is substantial evidence to support the ALJ's decision and the ALJ sufficiently explained her analysis, this decision to deny benefits in this case should be affirmed.

## IV. CONCLUSION

For the reasons set forth in the Court's Memorandum Opinion and Order, Claimant Steven Machalinski's motion for summary judgment is denied [Dkt.#12]. The Commissioner's cross-motion is granted [Dkt.#17], and the decision denying Claimant's application for a closed period of disability benefits is affirmed.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: November 18, 2013